# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

CYNTHIA SCHMALZ,

                    Case No. 3:11-cv-145

    Plaintiff,

    vs.                      Judge Timothy S. Black

NORTHROP GRUMMAN
CORPORATION,

    Defendant.

## ORDER THAT: (1) DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 15) IS GRANTED; AND (2) THIS CASE IS CLOSED

This civil action is before the Court on Defendant's motion for summary judgment (Doc. 15), and the parties' responsive memoranda (Docs. 19, 22).

## I.     BACKGROUND INFORMATION

Plaintiff, an administrative assistant at Northrop Grumman Corporation, brings three claims of sexual harassment and retaliation against her former employer: (1) hostile environment sexual harassment (Count I); (2) *quid pro quo* sexual harassment (Count II); and (3) retaliation (Count III).  Defendant argues that Plaintiff cannot satisfy the *prima facie* elements necessary to proceed with any of her claims.

## II.     UNDISPUTED FACTS[1]

1.    In December 2001, Plaintiff commenced employment as a secretary with TRW, Inc., a predecessor to Northrop.[2]   (Doc. 16, Ex. 1 at 24-25; Ex. B).

---

[1]  *See* proposed undisputed facts submitted by both Defendant (Doc. 15, Ex. 2) and Plaintiff (Doc. 20).

[2]   TRW, Inc. was renamed Northrop Grumman Space and Mission Systems Corporation in 2002 and merged into Northrop in 2010.

2.    Upon hire, Plaintiff signed and acknowledged that she had received training during new hire orientation, including policies related to legal and ethical compliance and sexual harassment.  (*Id*. at 65; Ex. K).

3.    Northrop promulgates a sexual harassment policy accessible on the employee website.  (Doc. 15, Ex. 8 at ¶ 3).

4.    Northrop's policy prohibits sexual harassment and provides multiple reporting avenues for employees to report any such harassment. The policy states in pertinent part: Employees who believe they have been subjected to workplace harassment or retaliation, or who are aware of such an issue, must report the matter to their manager, Human Resources, the Equal Employment Opportunity (EEO)/Diversity program office, or the Ethics OpenLine. Each report of harassment or retaliation is investigated in a timely, thorough, and confidential manner.  (Doc. 16, Ex. 1).

5.    Plaintiff knew that Northrop had a workplace harassment policy, that Northrop's employment policies were on an employee website, and she knew how to access the website.  (*Id.* at 44-46).

6.    Plaintiff became aware of the OpenLine procedures when she received a "card" from Northrop, sometime prior to 2010 and further understood "you could call [OpenLine] twenty-four hours a day."  (*Id.* at 46-47).

7.    Upon Plaintiff's hire in 2001, Plaintiff reported to Executive Director Terry Brim as his "personal assistant."  (Doc. 16, Ex. 1 at 24-26, 34-35; Ex. 2; Ex. 6 at 9-10).

8.    Plaintiff enjoyed being the "lead" secretary, sitting outside the Director's door and reporting directly to the Director.  (Doc. 16, Ex. 1 at 275).

9.    Plaintiff's job duties included "records maintenance, compiling data for reports, administration associated with the budget process, scheduling appointments and meetings, calendar maintenance for management level employees, answering/routing telephone calls and preparing reports and presentations."  (*Id.*, Exs. D, E, F).

10.   Plaintiff supported four other executives at the time of her hire.  (*Id.*, Ex. 1 at 35-36).

11.     Plaintiff remained Brim's assistant until he retired on or about December 2009. (*Id.* at 26).

12.     Plaintiff's job duties remained essentially the same throughout that time. (*Id.* at 36-38, 40-41; Exs. D, E, F).

13.     The number of additional executive staff Plaintiff supported while working for Brim (four) remained the same. (*Id.* at 37-38; Ex. F).[3]

15.     On December 16, 2009, prior to Wright's hire, Plaintiff contacted Wright and gave him her personal cell phone number in an email, inviting him "to call [her] on [her] cell …anytime." (*Id.*, Ex. N).

16.     On December 18, 2009, Plaintiff again emailed Wright, telling him that she "will be [his] strongest advocate and a confidante [he] can trust" and that she knew how senior management thinks, "who can be trusted, and what agenda's [sic] they have." (*Id.*, Ex. O).

17.     Plaintiff first met Wright in person on December 22, 2009. After the meeting, Plaintiff emailed Wright stating "I enjoyed our visit today and look forward to a wonderful year of growth and positive change. After I left you with Steve I received many positive comments from those you met. Everyone commented on your friendliness. You made a great first impression." (*Id.*, Ex. Q).

18.     Plaintiff alleges that during the December 22 meeting, Wright "did a full lookover of my body, and then he also –I – I saw him staring at my breasts," and that he asked Plaintiff for her cell phone number even though she had already given it to him; Plaintiff further alleges that Wright told Plaintiff he wanted them to "be joined at the hip… literally." (*Id.* at 83-84, 93; Exs. J, N).

19.     Wright's management style was very different than Brim's. Brim required employees to work on their individual tasks and saw little value in crossover work, whereas Wright wanted to run the organization as a collective team. (*Id.* at 276; Ex. 5 at 11-12, Ex. 6 at 9-11).

---

[3] Plaintiff denies that she learned that Eric Wright would be replacing Brim as Executive Director and that prior to meeting him, she was concerned about working for Brim's replacement.

20.    Plaintiff enjoyed being the "lead admin" and felt that it was a "higher position" than the other administrative assistants. (*Id.* at 275-76). "Well, that changed and it became – he lumped us all together." (*Id.*)

21.    Plaintiff did not like being "lumped" in with the other assistants: "without sounding like a spoiled child, I was – I wasn't used to being, you know, lumped into – my – my job description was very different. I supported the director---….and it was almost like he was trying to say, you know, I don't give any weight to your position." (*Id.* at 275).

22.    Plaintiff alleges the following incidents occurred in January and February 2010:

      a.    On January 6, 2010 Wright told Plaintiff that he "couldn't leave [the office] without seeing her" (*Id.* at 124);

      b.    On or about January 8, 2010, Wright called Plaintiff and stated that he wanted them to be "close enough to complete each other's thoughts" and to have a "deep connection" (*Id.* at 130);

      c.    On January 11, 2011 on a telephone call, Wright asked Plaintiff if she was "excited that [he would] be coming", when she responded "yes", he responded, "If I can get you excited you'll definitely make me come. I think you know what I mean. I want you and I to be as one…intimate friends walking lock step." (*Id.* at 177-78; Ex. J);

      d.    On February 15, Wright "leered" at Plaintiff in a sexual manner. (*Id.* at 191; Ex. J).

23.    Despite these allegations, Plaintiff never complained to anyone at Northrop. (*Id*. at 87-88, 116-17, 267).

24.    In fact, after these alleged incidents, Plaintiff sent the following email communications to Wright: January 28, "Everything is wonderful here and morale is high; January 28, "Just a warning that when you come in [things look different] – so you don't think you went to the wrong pod . . .ha-ha-ha!. . .See you soon!"; February 4, "Just a thought, I'm not trying to be bossy (well maybe a little) but perhaps you should stay home tomorrow as well and use Friday through the weekend to get yourself 100% . . . Let me

know if you need ANYTHING! . . .What am I hearing around STA? Only that you are the best thing that has happened around here in a long time. . . I can honestly say, I have not heard one negative thing from anyone. . . I think with your leadership we are a team that is destined to WIN!" (*Id.*, Exs. T, V, W).[4]

25. On February 18, 2010, during a meeting, Plaintiff alleges that she told Wright that his "soul mate attitude" and "inappropriate looks" make her uncomfortable. According to Plaintiff, after she told Wright that he made her uncomfortable, the conduct stopped. (*Id.*, Ex. 1 at 195-96).

26. From March 16 until May 4, 2010, Plaintiff went on medical leave for a kidney issue. Wright approved Plaintiff's absences for medical leave. (*Id.*, Ex. 1 at 187; Exs. X, AA).[5]

27. Plaintiff openly shared the details of her medical condition with Wright while absent or on leave, frequently "thanking" him in emails for his prayers and support. (*Id.*, Exs. BB, CC, EE, FF, HH, II, JJ, KK, LL, MM). Wright likewise conveyed concern for Plaintiff's recovery in responsive email correspondences. (*Id.*, Exs. CC, II, MM).[6]

28. On April 23, 2010, Wright and his wife visited Plaintiff (and the wife of another co-worker) in the hospital to bring a gift card and candy. (*Id.*, Ex. 1 at 207-08; Ex. MM). Unbeknown to Wright, Plaintiff had been discharged from the hospital, so Wright and his wife dropped the gifts off at Plaintiff's home, meeting Plaintiff's husband in the driveway. (*Id.*)

29. In response, Plaintiff sent Wright an email that his "thoughtfulness was overwhelming" and thanking him "for all [his] prayers and support during

---

[4] Plaintiff denies this statement to the extent that she sent an email on January 28, 2011. Specifically, Plaintiff claims that the email was sent on January 26, 2009.

[5] Plaintiff claims that Ex. X is unrelated to her medical leave of absence; and she was only able to "guess" that Ex. AA related to her kidney leave. (Doc. 16, Ex. 1 at 185-86).

[6] Plaintiff denies this statement to the extent that she was "frequently thanking [Eric Wright] in emails for his prayers and support."

this time." (*Id.*, Ex. 1 at 223-24; Ex. MM).[7]

30.    Plaintiff returned to work on May 4, 2010. (*Id.* at 224-25).

31.    On May 12, 2010, at Wright's request, Plaintiff sent an email to the other administrative assistants noting, "Eric has asked me to schedule and lead monthly admin meetings. Sounds to me like a good excuse for some fun while improving our relationships and skills!" (*Id.*, Ex. DD).[8]

32.    Plaintiff thought Wright's request to meet with the other admins was a "reasonable" request, but, contrary to the tone of her email, also took offense: "He had told me to do this in a way that was – I want you to get close to the other admins, like he thought I wasn't close to them. It was almost in a threatening way." (*Id.*, Ex. 1 at 234).

33.    On May 17, 2010, Wright and Plaintiff met to discuss her goals and objectives for 2010. (*Id.* at 242-43). During the meeting, Wright asked Plaintiff to build a better working relationship with the other administrative assistants and further asked her to take down "partitions" around her work station.[9] (*Id.* at 243).

34.    During the May 17 meeting, Plaintiff claims that Wright kept "bringing up things that were nonexistent issues, things that weren't even problems, telling me I didn't get along with the other admins." (*Id.* at 243).

35.    During the May 17 meeting, Plaintiff further claims Wright told her to "get [her] shit together" during the meeting. (*Id.* at 250-51).

36.    After the May 17 meeting, Plaintiff suggested to Wright in an email that she and Wright have "regular weekly meetings" and further stated, "I feel there is a disconnect between us." (*Id.*, Ex. RR).

_____

[7] Plaintiff denies this statement to the extent that the motivation for the email was purely as a response to Eric Wright's uninvited arrival at her house. (Doc. 16, Ex. 1 at 224).

[8] Plaintiff denies this statement to the extent that Ex. DD is a March 4, 2010 email with an attachment listing administrative duties.

[9] Plaintiff did not agree with or understand Mr. Wright's request to remove the partitions (Doc. 16, Ex. 1 at 234), but she still complied with his request: "If he wanted it down, I was fine with taking it down." (*Id.* at 249).

37.  On or about May 25, 2010 Jim Barefield began working at Northrop.  (*Id.*, J).

38.  Plaintiff supported Barefield as he was John Bittorie's replacement, so it was "a trade-off."  (*Id.* at 259-60).

39.  Plaintiff claims that Barefield engaged in the following inappropriate conduct:

    a.  On June 2, 2012, Barefield asked Plaintiff if she collected anything because he travels extensively (*Id.* at 258);

    b.  On June 10, 2012, Barefield put his hand above her knee over her pants for less than 5 seconds while driving to lunch; while at lunch, "he didn't say anything sexual" but asked her about personal things such as her "likes and dislikes" (*Id*. at 260, 262-63);

    c.  After the lunch, he sent her an email that stated "the cuisine paled in comparison to her company" (*Id.* at 264);

    d.  He squeezed Plaintiff's hand for a couple seconds and "brushed" her hand with his hand on two-three occasions (*Id.* at 265-67).[10]

40.  Plaintiff never reported this conduct to anyone at Northrop.  (*Id.* at 267-68, 271).

41.  In June 2010, Wright charged Operations Manager Don Hoendorf to work with the four administrative assistants to ensure they worked as a team and to distribute administrative tasks efficiently.  As part of completing the Administrative Support Task Distribution list, Hoendorf solicited input from all of the administrative assistants, including Plaintiff.  (*Id.*, Ex. VV). Plaintiff had significant input into the process.  (*Id.*, Ex. 1 at 278-79).[11]

---

[10]  Plaintiff denies this statement to the extent that it purports to be an exhaustive list.  (Doc. 16, Ex. 1 at 256, 258-59, 264, 338).

[11]  Plaintiff denies this statement to the extent that she had "significant" input in the process. (Doc. 16, Ex. 1 at 279).  Plaintiff claims that the record merely states that all of the administrators that "input" into their duties, not "significant input."

42.    Plaintiff gave feedback to Hoendorf, noting that she already supported five heavy travelers (Wright, plus four executives, including Barefield) and expressed concern about the additional responsibility of "technical editing." (*Id.*, Ex. WW).

43.    In response to Plaintiff's concerns, Mr. Hoendorf removed the technical editing task from Plaintiff. (*Id.* at 288-89; Ex. XX).

44.    In May and June 2010, Wright began documenting performance concerns regarding Plaintiff (related to issues such as leaving early, communication, and travel mistakes). (*Id.* at Ex. QQ).[12]

46.    During this same time, Plaintiff documented concerns about Wright "taking a hands off attitude toward me" in a personal log. (*Id.*, Ex. J). For example, Plaintiff claims Wright repeatedly "ignored" her and told her "I don't care" when she asked about attendance at a meeting. (*Id.*) When Plaintiff confronted Wright, she alleges he responded, "At the very beginning I gave you an open invitation to connect with me and you weren't willing." (*Id.*)

47.    On or about June 30, 2010 Plaintiff called OpenLine, inquiring about the process for making a sexual harassment complaint. (*Id.*, Ex. 1 at 317-320).

48.    Plaintiff learned that a complaint would be reported to HR and investigated: "[I] was told any complaints are reported to HR and investigated by talking with the person's superiors and work associates." (*Id.*, Ex. EEE).

49.    Plaintiff believed her "job would be threatened" if she made the complaint, due to Wright's position in the company. Accordingly, Plaintiff "declined to make the complaint." (*Id.*)[13]

---

[12] Plaintiff denies this statement to the extent that it represented actual performance concerns (Doc. 16, Ex. 1 at 363-64, 366, 329-31), but admits that Mr. Wright began compiling the list in May and June of 2010. Defendant claims that Mr. Wright never gave Plaintiff a copy of the performance documentation; however, Plaintiff obtained a copy when she allegedly "accidentally stumbled upon it" in the deleted messages in her electronic mailbox. (*Id.* at 241). Plaintiff denies this claim and maintains that she recovered the email from the recover deleted items folder, not the deleted items folder; two different folders in MS Outlook. (*Id.* at 240-41).

[13] Plaintiff denies this statement to the extent that her sole reason for not using the OpenLine was because of Mr. Wright's position in the company. (Doc. 16, Ex. 1 at 107).

50. On or about July 6, Plaintiff allegedly "overheard" a conversation between Wright and Manager Nancy Evans. Plaintiff documented the conversation in her journal: "My filing cabinet is right in front of Nancy's door - so I made a trip to it and heard his conversation. He is trying to get rid of me." (*Id.*, Ex. FFF).[14]

51. On July 7, Plaintiff confronted Wright in his office, repeatedly asking him why he did not "trust" her to book his travel. She again documented this conversation in her journal (*Id.*, Ex. FFF) and secretly recorded it on her iPhone. (Doc. 15, Ex. 3).

53. The recorded conversation of July 7 reveals that Wright told Plaintiff she was "disrespectful" and told her to "drop this" – that she was acting like a "wiseacre." When Plaintiff pressed Wright regarding the meaning of "wiseacre," he responded, "Somebody who won't say what she really means but is a smartass." Plaintiff further claims that Wright said, "If your problem is PMS or in your case menopause, get on some meds!" This last statement appears in Plaintiff's journal but not on the iPhone recording. (Doc. 16, Ex. 1 at 299-300; Ex. FFF; Doc. 15, Ex. 3).

54. Later on July 7, Plaintiff again confronted Wright in his office. This time, Plaintiff brought a copy of the performance documentation prepared by Wright that she had inadvertently obtained in her "recovered deleted items" file. (Doc. 16, Ex. 1 at 241; Ex. FFF).[15]

55. When Plaintiff presented the performance documentation, Wright was surprised and asked, "How did you get a copy of that?" Wright informed Plaintiff that he was intending to share the comments in her performance review, asking her to meet later that day for a mid-year evaluation. (*Id.*, Ex. FFF).

56. After learning of the evaluation, Plaintiff announced her intention to bring her attorney to the performance review, and Wright cancelled the meeting and told Plaintiff, "Today's not a good day to do your review." (*Id.*, Ex. 1

---

[14] Plaintiff denies this statement to the extent that it purports to contain the entire conversation. (Doc. 16, Ex. 1 at 297; Doc. 1 at ¶ 81).

[15] Plaintiff denies this statement to the extent that Ex. QQ actually reflected her performance. (*See* Note 9, *supra*).

at 362; Ex. FFF).

57. Upon the events of July 7, 2010, Plaintiff emailed Wright the early morning of July 8: "I am not in a condition to come into work today and will be taking either DTO or vacation for the remainder of the week." (*Id.*, Ex. BBB).

58. The morning of July 8, Human Resources representative Michelle Keith emailed Plaintiff, asking to discuss the situation. (*Id.*, Ex. DDD).

59. On July 8, Plaintiff responded to Ms. Keith, "I am just unable to talk with you." Ms. Keith again expressed concern, suggesting a time for a call. (*Id.*)

60. On July 9, Plaintiff emailed Ms. Keith, explaining that she had already declined to make an OpenLine complaint: "Although I'm sure at some point you will learn all the details, for now, I am not comfortable speaking with you about it." (*Id.*, Ex. EEE).

61. In the July 9 email correspondence, Plaintiff further told Ms. Keith of her discomfort of Wright but failed to make any allegations of sexual harassment. Ms. Keith immediately responded, assuring Plaintiff she would not share her email with Wright and explained, "we are not out to fire you." Ms. Keith explained that mid-year reviews are standard procedure and offered to be on the phone as a "mediator." (*Id.*)

62. In the July 9 email correspondence, Ms. Keith also offered to explore other job assignments with Plaintiff: "If you feel you might need to move to another area to be more comfortable, we can talk about that." (*Id.*) Plaintiff declined to discuss such options. (Doc. 16, Ex. 1 at 324-25).

63. Since July 7, 2010, Plaintiff has not returned to work. Plaintiff is on medical leave of absence and currently has no plans to return to work. (*Id.* at 384-85).

### III.   STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter fo law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of showing, by

identifying specific evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," that there exists no genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the movant meets its burden, it is then the opposing party's duty to "set forth specific facts showing there is a genuine [dispute] for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also* Fed. R. Civ. P. 56(a).

The requirement that the dispute be "genuine" is emphasized. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48. Therefore, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id*. at 252. Furthermore, the non-moving party may not merely rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

"Weighing of the evidence or making credibility determinations are prohibited at summary judgment  -  rather, all facts must be viewed in the light most favorable to the non-moving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir.

2007); citing *Matsushita*, 475 U.S. at 587. A court's obligation at the summary judgment stage is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## IV.    ANALYSIS

Section 703(a)(1) of Title VII forbids "an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  The terms "*quid pro quo*" and "hostile work environment" do not appear in the statutory text, yet the Supreme Court has sanctioned both such claims and federal regulations seek to define them.  *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65, 91 (1986); 20 CFR § 1604.11(a).  CFR § 1604.11 (a)(1) and (2) describe *quid pro quo* sexual harassment, while (a)(3) describes hostile work environment sexual harassment:

> (a) Harassment on the basis of sex is a violation of Section 703 of Title VII.  Unwelcome sexual advances, request for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

**A.      Hostile Work Environment Sexual Harassment (Count I)**

To establish a *prima facie* case based upon Eric Wright's or Jim Barefield's conduct, Plaintiff must prove that she was subjected to unwelcome sexual harassment of a severe or pervasive nature that interfered with her work performance and created a hostile environment, as well as a basis for vicarious liability against Defendant. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999). Specifically, Plaintiff must establish that: (1) she was a member of a protected class; (2) was subjected to unwelcome harassment based on sex; (3) the harassment had the effect of unreasonably interfering with her work performance and creating an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the employer. *Gallagher v. C.H Robinson Worldwide, Inc.*, 567 F.3d 263, 270 (6th Cir. 2009). The third and fourth elements are at issue.

Plaintiff alleges that the following incidents contributed to the hostile work environment:

1.      Mr. Wright told Plaintiff have he "couldn't leave [the office] without seeing her." (Doc. 16, Ex. 1 at 124).

2.      Mr. Wright repeatedly told Plaintiff that he wanted them to be "very open" and "very close." (*Id.* at 83).

3.      Mr. Wright told Plaintiff that he wanted them to be "joined at the hip. . . literally." He said, "[D]id I say that out loud? Shame on me." (*Id.*)

4.     Mr. Wright "leered" at Plaintiff in a sexually inappropriate manner. (*Id.* at 191).

5.     Mr. Wright did a full body scan of Plaintiff. (*Id.* at 114).

6.     Mr. Wight looked down Plaintiff's shirt. (*Id.* at 115).

7.     Mr. Wright "talked about us being close enough to complete each other's thoughts. He said he wanted us to have a deep connection." (*Id.* at 130).

8.     On a telephone call, Mr. Wright asked Plaintiff if she was "excited that [he would' be coming," when she responded "yes," he responded, "If I can get you excited you'll definitely make me come. I think you know what I mean. I want you and I to be as one . . . intimate friends walking lock step." (*Id.* at 177-78).

9.     Mr. Wright got too close to Plaintiff while he was speaking. (*Id.* at 158).

10.    Mr. Wright attempted to visit Plaintiff and another employee's wife at the hospital, however Plaintiff had already returned home. Although Plaintiff's husband said he would pick the gifts up at the office, Mr. Wright insisted on going to Plaintiff's home. (*Id.* at 208-09, 222). Mr. Wright's wife was allegedly in the car when he dropped off the gifts. (*Id.*)

11.    Mr. Barefield told Plaintiff that he wanted to take her to lunch on a weekly basis and that they should challenge themselves to find a new place each time. (*Id.* at 256).

12.    Mr. Barefield asked Plaintiff if she collected anything because he travels extensively. He told Plaintiff he wanted to bring her back something every time he traveled. (*Id.* at 258).

13.    Mr. Barefield placed his hand on Plaintiff's knee over her pants for less than 5 seconds while driving to lunch. (*Id.* at 259).

14.    While at lunch "he didn't say anything sexual" but asked her about personal things such as her "likes and dislikes." (*Id.* at 260, 262-63).

15.    Mr. Barefield stared into Plaintiff's eyes. (*Id.*)

16.  Mr. Barefield "tricked" Plaintiff into ordering desert at lunch "because he just wanted to watch her eat it."  (*Id*. at 264).

17.  After lunch Mr. Barefield sent Plaintiff an email that stated "the cuisine paled in comparison to her company."  (*Id.*)

18.  Mr. Barefield squeezed Plaintiff's hand for a couple seconds and "brushed" her hand with his hand on two or three occasions.  (*Id*. at 265-67).

19.  Mr. Barefield purchased a gift for Plaintiff.  (*Id*. at 338).[16]

To assess whether Plaintiff can show actionable sexual harassment, the court must consider "'all of the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance.'"  *Jackson v. Quanex Corp.*, 191 F.3d, 647, 658 (6th Cir. 1999).  The "conduct in question must be judged by both an objective and a subjective standard: the conduct must be severe or pervasive enough to create an environment that a reasonable

---

[16] Plaintiff compares the facts of the instant case to those in *Williams v. Gen. Motors Corp.*, 187 F.3d 553 (6th Cir. 1999), where an issue of fact was held to exist when the following events occurred from June 1995 through September 1995: the F-word was used around plaintiff; plaintiff was called a slut; plaintiff's supervisor told her that she could "rub up against [him] any time" and "you would kill me, Marylin.  I don't know if I can handle it, but I'd die with a smile on my face."; plaintiff's supervisor said, "Back up; just back up," or "you can back right up to me,"; after seeing plaintiff write the word "Hancock," her supervisor said "you left the dick out of the hand."; coworker's conspired to make her take the night shift; a box was glued to her desk; a coworker said "I'm sick and tired of these fucking women"; the same coworker threw a box that grazed but did not hurt plaintiff; plaintiff was denied overtime; plaintiff was the only person without a key to the office; plaintiff was not allowed to sit at a table with a window; plaintiff's work area was blocked, and she needed help clearing it; another female coworker padlocked plaintiff's building's main entrance with her inside; and on a couple of occasions some materials were blocking an alternative exit.  *Id*. at 559.  The Court finds that these facts are significantly more severe than the facts alleged in the instant case.

person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Id.* at 658. To show an objectively abusive environment, the harassment must be "ongoing," "commonplace," and continuing." *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 717 (6th Cir. 2012). When a court considers the issue of severe or pervasiveness, it must look at the totality of the circumstances. *Perlman v. United States*, 490 F.2d 928, 933 (1974). Additionally, non-sexual conduct may be illegally sex-based where it evinces "anti-female animus, and therefore can be found to have contributed significantly to the hostile environment." *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 905 (1st Cir. 1988).[17]

Plaintiff maintains that she was harassed because of her sex from December 2009 until July 2010. (Doc. 16, Ex. 1 at 411). She claims that the conduct made her "uncomfortable" and gave her a "creepy feeling." (*Id.* at 84, 88). On February 18, 2010, after Plaintiff told Mr. Wright that his "soul mate attitude" and "inappropriate looks" made her uncomfortable, the conduct stopped. (Doc. 20 at ¶ 25; Doc. 16, Ex. 1 at 195-

---

[17] Finding sufficient evidence of severe or pervasive sexual harassment where there was a "[b]arrage of commentary by [several male] residents that women in general, and plaintiff in particular, should not be surgeons; pointed threats made by Dr. Novoa to other residents and to plaintiff herself that he would drive her out of the program; repeated unwelcome sexual advances made to plaintiff; hostile behavior directed against plaintiff by these men once it became clear to them that she would not accede to their demands; degrading pinups-including Playboy centerfolds; a sexually explicit drawing of plaintiff's body; a list containing sexually charged nicknames of the female residents plastered on the walls of the male residents' facility; and finally plaintiff's particular nickname, 'Selastrage,' which . . . means 'she swallows them.'" *Id.* at 903. Additionally, other women submitted sworn testimony that they were also subject to a sexually hostile environment and blatant "anti-female commentary." *Id.* at 904.

96).

Upon review of the alleged incidents, the Court finds that these allegations are insufficient to rise to the level of actionable harassment under established case law. *See, e.g., Stevens v. Henderson*, No. C-2-98-615, 2000 U.S. Dist. LEXIS 22498, at *10-12 (S.D. Ohio 2000) (evidence of "a tray label card with a rose drawn on it[,] . . . a letter . . . that stated [co-worker's] desire to become plaintiff's secret love, that he wanted the plaintiff to 'feel good,' that plaintiff had a 'sexy body,' and that he wanted to give plaintiff a 'tongue bath' and feelings of being 'uncomfortable'" around co-worker not severe or pervasive under the law).[18]  Considering the totality of the circumstances, the Court finds that the conduct of Mr. Wright and Mr. Barefield does not rise to the level of severity or pervasiveness required by the Sixth Circuit.[19]  Although the actions and

---

[18]  *See also Hensman v. City of Riverview,* No. 08cv1454, 2009 U.S. App. LEXIS 4869, at *413-17 (6th Cir. Mar. 10, 2009) (concluding that the following conduct was not "severe or pervasive": (1) supervisor told plaintiff he was too distracted by how attractive she was; (2) complimented her perfume by "sniffing" her; (3) described her as voluptuous and well-endowed on two occasions; (4) went to her house and told her "you look cute in your jammies" (5) hugged her on three occasions; (6) told her "You're beautiful.  I couldn't do this job without you, you are the backbone of this building . . . I'm very thankful to have you."; and (7) told her "I want us to have a close working relationship, [like] a marriage, if you will"); *Stacy v. Shoney's Inc.*, 142 F.3d 436 (6th Cir. Mar. 31, 1998) (a hostile work environment was not shown where a male supervisor continuously made sexually suggestive comments about the female plaintiff's appearance, touched her breast as he removed and replaced a pen from her shirt pocket, leered at her, and told her that if he had someone like her, he would never let her leave the house).

[19]  Since the Court has concluded that Plaintiff cannot demonstrate the existence of a hostile work environment, there is no need to reach the issue of vicarious liability.  An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

comments allegedly made by both Mr. Wright an Mr. Barefield were clearly offensive and unprofessional, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).[20]

## B. *Quid Pro Quo* Sexual Harassment (Count II)

The Sixth Circuit has defined *quid pro quo* sexual harassment as harassment that is "anchored in an employer's sexually discriminatory behavior which compels an employee to elect between acceding to sexual demands and forfeiting job benefits, continued employment or promotion, or otherwise suffering tangible job detriments." *Highlander v. K.F.C. Nat'l Mgmt. Co.*, 805 F.2d 644, 648 (1986). To succeed on a *quid pro quo* sexual harassment claim, Plaintiff must prove: (1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors; (3) the harassment was based on her sex; (4) that either her submission to the unwelcome advances of a supervisor was an express or implied condition for receiving job benefits or her refusal to submit to the supervisor's unwelcome demands resulted in a tangible employment action (also called an adverse employment action); and (5) liability may be imputed to the employer. *Sanford v. Main*

---

[20] The United States Supreme Court has emphasized that Title VII is not a general civility code. *Faragher*, 524 U.S. at 788. Even if a supervisor does not conduct him or herself in a professional manner, sexual harassment statutes were "not designed to purge the workplace of vulgarity." *Grigaliunas v. Rockwell Int'l Corp.*, No. 3:98cv7351, 1999 U.S. Dist. LEXIS 13414, at *3, 7-9 (N.D. Ohio July 6, 1999) (finding no severe or pervasive sexual harassment where a coworker made sexually suggestive comments on a daily basis and kissed and hugged plaintiff without consent on multiple occasions).

*St. Baptist Church Manor, Inc.*, 327 Fed. Appx. 587, 596-97 (6th Cir. 2009).

### 1.    *Unwelcome advances or requests for sexual favors*

To demonstrate a request for a sexual favor or sexual advance, a plaintiff must present "some evidence that, from an objective perspective, the alleged conduct carried with it an express or implied request for sexual favors in return for some action affecting the plaintiff's terms or conditions of employment." *Thomas v. Henderson*, 44 F. Supp. 2d 915, 926 (E.D. Mich. 1999).

Defendant argues that Plaintiff was not subjected to sexual advances or requests for sexual favors.

> Q.    Did [Mr. Wright] ever request a sexual favor?
> A.    What is a sexual favor?
> Q.    A request to have sex with you or a sexual relationship?
> A.    No.
> Q.    Okay.  Did he ever touch you in a sexually inappropriate way?
> A.    No.

(Doc. 16, Ex. 1 at 181).[21]  Plaintiff also acknowledges that Mr. Barefield did not make any sexual advances or requests for sexual favors.  (*Id.* at 256-67).  *See also Moorer v. Summit Cnty. Dep't of Job & Family Servs.*, Case No. 5:10cv457, 2011 U.S. Dist. LEXIS 76083, at *24 (N.D. Ohio July 14, 2011) (granting summary judgment for employer on the plaintiff's *quid pro quo* harassment claim finding no evidence of a "sexual demand"

---

[21] Q.  And did [Wright] make any advances to you? . . . Either verbally or nonverbally flirt
     with you?
     A.  No.
(Doc. 16, Ex. 1 at 196).

-19-

where the plaintiff alleged teasing and offhand comments).

Accordingly, the Court finds that Plaintiff has failed to evidence sexual harassment in the form of sexual advances or requests for sexual favors sufficient to maintain a claim for *quid pro quo* sexual harassment.

### 2. *A tangible job detriment*

Even if Plaintiff were able to evidence sexual demands, she is unable to evidence a tangible job detriment. The Supreme Court defines a "tangible employment action" as, "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761. "While *de minimis* employment actions and 'very temporary' actions are not materially adverse and, thus, not actionable under Title VII, those involving changes such as a termination or a suspension constitute adverse employment actions." *Howington v. Quality Rest. Concepts*, 298 Fed. Appx. 436, 442 (6th Cir. 2008). To satisfy this element, Plaintiff must prove that a causal relationship exists between the tangible employment action and the sexual harassment. *Sanford*, 327 Fed. Appx. at 597. To prove causality, Plaintiff must show that she was subjected to a tangible employment action "because of" Mr. Wright or Mr. Barefield's sexual harassment. *Id*. at 599.

Plaintiff alleges that from December 2009 until May 5, 2010, Mr. Wright attempted to start a sexual relationship with her. (Doc. 16, Ex. 1 at 409-410). However, there is nothing in the record to demonstrate that Mr. Wright or Mr. Barefield ever told

Plaintiff that she must succumb to sexual requests or sexual advances as an express or implied condition for receiving job benefits. (*Id*. at 181, 196; 256-57).

Moreover, Plaintiff cannot prove that she suffered a tangible job action. Plaintiff never lost any pay, her title did not change, and she was not demoted – at most she was "lumped" together with other administrative assistants.[22] Not only is this "change" insufficient to constitute a significant change in employment conditions, it is undisputed that Plaintiff had input into the administrative task realignment led by Operations Manager Don Hoendorf, not Mr. Wright or Mr. Barefield. "[A] change in employment conditions 'must be more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Crady v. Liberty Nat. Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993).

---

[22]  With respect to Mr. Wright's "draft" performance documentation, Plaintiff admits that she never received a performance review and only obtained the documentation "accidentally" in her recovered deleted items. (Doc. 16, Ex. 1 at 241). Given that Plaintiff's performance evaluation never occurred, it cannot constitute a "materially adverse" employment action. *Spence v. Potter*, No. 1:07cv526, 2011 U.S. Dist. LEXIS 7402, at * 9-12 (S.D. Ohio Jan. 26, 2011) ("Scheduling of a pre-disciplinary hearing" cannot reasonably be seen to be a "materially adverse employment action"). Moreover, negative performance reviews are not adverse actions unless they actually impact an employee's wages and advancement. *Halface v. Home Depot, Inc.*, 221 Fed. Appx. 424, 432-33 (6th Cir. 2007) (low employee performance evaluation scores only constitute a "materially adverse" employment action if they actually impacted the employee's wages and professional advancement). *See, e.g., Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 789-90 (6th Cir. 2000) (affirming summary judgment on claims finding a downgraded evaluation did not result in a tangible employment action); *Allen v. Ohio Dep't. of Job & Family Servs.*, Case No. 2:05cv707, 2007 U.S. Dist. LEXIS 70850, at *21 (S.D. Ohio Sept. 25, 2007) (finding no tangible employment action in *quid pro quo* claim where the plaintiff alleged she was denied "flex" time, travel to meetings, and had her work "scrutinized"); *Hall v. Hebrank*, 102 F. Supp. 2d 844, 854-55 (S.D. Ohio 1999) (finding no tangible employment action in *quid pro quo* claim where plaintiff was given additional job duties).

To the extent that Plaintiff claims that her "constructive discharge" suffices as a tangible job action, her argument fails. Whether a person has been constructively discharged requires a showing that "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982). Plaintiff went on medical leave due to the alleged harassment. (Doc. 16, Ex 1 at 386-87). Therefore, she argues that a jury could find that a reasonable person in her shoes would have felt compelled to resign. However, Plaintiff states quite clearly that she never quit.[23] (Doc. 1 at ¶ 94; Doc. 16, Ex. 1 at 314). By Plaintiff's own admission, she did not resign and therefore cannot claim constructive discharge. *E.E.O.C. v. Spitzer Mgmt.*, No. 1:06cv2337, 2012 U.S. Dist. LEXIS 44686, at *12 (N.D. Ohio Mar. 30, 1212).

Consequently, the record is devoid of any evidence tending to demonstrate that Plaintiff was denied a job benefit or suffered a job detriment for a failure to accede to a sexual demand of either Mr. Wright or Mr. Barefield. There is no material issue of fact in dispute precluding the conclusion as a matter of law that Plaintiff cannot make a *prima facie* case for *quid pro quo* sexual harassment.

### C.  Retaliation (Count III)

To present a *prima facie* case for retaliation, Plaintiff must prove: (1) she engaged in activity protected by Title VII; (2) defendant had knowledge of her protected conduct;

---

[23] Plaintiff is currently on a medical leave of absence with no plans to return. (Doc. 16, Ex. 1 at 384-85).

(3) defendant thereafter took an adverse employment action against her; and (4) there was

a causal connection between the protected activity and the adverse employment action.

*Sanford*, 327 Fed. Appx. at 599 (citing *Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d

367, 381 (6th Cir. 2002)). Importantly, Plaintiff's "burden of establishing a *prima facie*

case in a retaliation action is not onerous, but one easily met." *DiCarlo*, 358 F.3d at 420.

The third and fourth prongs are at issue.

### 1.     *Materially adverse action*

It is undisputed that Plaintiff was not terminated, demoted, subject to a reduction

in wages or other material means, or given a title change:

> Q.     Okay.  All right.  And you never received a pay decrease, right?
> A.     Decrease?
> Q.     Yeah.
> A.     No.
> Q.     Okay.  And you never received a demotion?
> A.     No.
> Q.     Okay.  And do you recall having input into the admin duties and
>        responsibilities?
> A.     All the admins had input into it.
> Q.     And that included you?
> A.     Yes.

(Doc. 16, Ex. 1 at 278-79).

For the reasons stated *supra* in Section IV.B.2, Plaintiff cannot establish a

materially adverse employment action.[24]

---

[24]  *Plautz v. Potter*, 156 Fed. Appx. 812, 817-19 (6th Cir. 2005) (plaintiff could not establish material adverse action based on constructive discharge in retaliation claim for same reasons it could not be met in discrimination and hostile work environment claims).

## 2.    *Causal Connection*

Even if Plaintiff could prove a materially adverse employment action, she cannot prove a causal connection.  In order to prove a causal connection, the evidence must be sufficient to raise an inference that the protected activity was the likely reason for Plaintiff's termination.  *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 563 (6th Cir. 2001).  Specifically, Plaintiff must show some evidence of a causal connection between the "protected activity" (her June 30 call to OpenLine or her February 18, 2010 conversation with Mr. Wright) and any adverse personnel action.

Plaintiff maintains that at least part of the reason Mr. Wright became increasingly hostile toward her following her surgeries in March 2010 had to do with a conversation she had with him on February 18, 2010.  During this conversation, Plaintiff told Mr. Wright that his behavior made her uncomfortable.  Therefore, Plaintiff claims that she engaged in the protected activity of opposing activity that she reasonably believed was unlawful.  However, such conduct, on its face, is deficient to establish any causation. *Alexander v. Ohio State Univ. Coll. of Soc. Work*, 697 F.Supp.2d 831, 851 (S.D. Ohio 2010) ("A plaintiff's subjective beliefs are insufficient to create an inference of retaliation.").

Next, there is no evidence that Mr. Wright knew about the June 30 call to OpenLine.  There can be no retaliation where the decision-maker had no knowledge of the protected activity.  *Mulhall v. Ashcroft*, 287 F.3d 543, 551-52 (6th Cir. 2002).  While Plaintiff claims she was "falsely accused of substandard work" and "given an increased

workload" as retaliation, the evidence shows that Mr. Wright's performance

documentation dated back to May 2010 – before the OpenLine call.  Moreover, even

assuming Plaintiff received an "increased workload," Mr. Wright had no involvement

with the redistribution of administrative tasks.  (Doc. 15, Ex. 6 at 19-21).

Therefore, Plaintiff has failed to allege facts sufficient to maintain a *prima facie*

case for retaliation.

## V.    CONCLUSION

Accordingly, for the reasons stated herein, Defendant's motion for summary

judgment (Doc. 15) is **GRANTED**, and this civil action is **TERMINATED** on the docket

of this Court.

**IT IS SO ORDERED.**

Date:  5/17/12                                         ___*s/ Timothy S. Black*_____
                                                      Timothy S. Black
                                                      United States District Judge